1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   PAUL ANDREW SHIELDS,                      No.  2:11-cv-3185 JAM AC P

12                Plaintiff,

13        v.                                   FINDINGS AND RECOMMENDATIONS

14   KELLY L. CANNON, et. al.,

15                Defendants.

16

17        Plaintiff is a state prisoner proceeding pro se and in forma pauperis in this action filed

18   pursuant to 42 U.S.C. § 1983.  This action proceeds on the first amended complaint filed

19   February 11, 2013, ECF No. 32.  The sole remaining defendants are Dr. Padilla and Sheriff Jones.

20   Pending before the court are defendants' motion for summary judgment, ECF No. 66, and

21   plaintiff's motion to amend the first amended complaint, ECF No. 64.  Both motions are fully

22   briefed.

23                           PROCEDURAL BACKGROUND

24        The original complaint alleged that plaintiff was denied medical treatment for hepatitis C

25   and cirrhosis in violation of the Eighth Amendment and that he was denied diabetic snacks in

26   violation of the First and Eighth Amendments.  ECF No. 1.  Defendants filed a motion to dismiss

27   the original complaint, ECF No. 13, which the court granted, ECF No. 28.  Plaintiff was given

28   leave to amend with respect to his denial of medical treatment claim only.  ECF No. 28.

1

1  On February 11, 2013, plaintiff filed a first amended complaint against defendants

2  Cannon, Maness, Padilla, and Jones.  ECF No. 32.  Defendants filed a motion to dismiss the first

3  amended complaint.  ECF No. 41.  By order dated September 18, 2013, the court granted the

4  motion to dismiss in part and denied it in part.  ECF No. 45.  The court granted the motion to

5  dismiss as to defendants Cannon and Maness, as well as to defendant Jones in his individual

6  capacity.  Because the court found that plaintiff stated a colorable deliberate indifference claim

7  and a colorable Monell claim, the court denied the motion to dismiss as to Padilla in his

8  individual capacity and Padilla and Jones in their official capacities.  Padilla and Jones answered

9  the complaint on January 13, 2014.  ECF No. 55.

10  On February 14, 2014, the court issued a discovery and scheduling order requiring all

11  pretrial motions to be filed on or before September 1, 2014.  ECF No. 56 at 5.  On August 22,

12  2014, plaintiff filed a motion for leave to amend the amended complaint, ECF No. 64,

13  accompanied by a proposed amended complaint, ECF No. 65.

14  On August 29, 2014, defendants Padilla and Jones filed a motion for summary judgment

15  on the first amended complaint.  ECF No. 66.  On September 11, 2014, defendants filed an

16  opposition to plaintiff's motion to amend the complaint.  ECF No. 67.  On September 22, 2014,

17  the court granted plaintiff's request for a thirty-day extension of time to file a response to

18  defendants' summary judgment motion.  Plaintiff replied to defendants' opposition to the motion

19  to amend on September 30, 2014.  ECF No. 72.  On October 27, 2014, plaintiff opposed

20  defendants' motion for summary judgment.  ECF No. 73.  Defendants replied to plaintiff's

21  opposition to the motion for summary judgment on November 5, 2014.  On February 3, 2015,

22  plaintiff filed a supplemental declaration in relation to his opposition to defendants' summary

23  judgment motion.  ECF No. 76.

24  ALLEGATIONS OF THE FIRST AMENDED COMPLAINT

25  Plaintiff asserts that Cannon, Maness, defendant Padilla, and defendant Jones violated his

26  rights under the Eighth Amendment when they failed to provide treatment for plaintiff's hepatitis

27  ////

28  ////

2

1   C and cirrhosis during his incarceration at the Sacramento County Main Jail (SCMJ).[1]

2   Specifically, plaintiff alleges that when he arrived at SCMJ on or about January 20, 2009, he

3   immediately notified medical staff of his medical issues and requested treatment.  Id. at 12.

4       On March 1, 2011, plaintiff submitted a health care service request for treatment of his

5   liver diseases, stating that he had severe abdominal pain and diarrhea.  Id. at ¶ 14.

6       On June 27, 2011, he filed a grievance stating that he had been trying to get treatment for

7   hepatitis C since he arrived at the jail but that his requests had been ignored.  Id. at ¶ 15.  On

8   August 16, 2011, he filed a second grievance requesting medical treatment.  Id. at ¶ 16 & Ex. H.

9       On September 2, 2011, Kelly Cannon, the Patient Grievance Coordinator for Correctional

10  Health Services, SSD, responded to plaintiff's grievances, advising him that he was being treated

11  for cirrhosis and that "Correctional Health does not treat Hepatitis C."  Id. at ¶ 17 & Ex. H.

12      On September 13, 2011, plaintiff filed an appeal directed to Eric Maness, the division

13  commander, to express dissatisfaction with Cannon's response.  ECF No. 32 at ¶ 18.  Maness did

14  not respond.  Id.  Instead, plaintiff received another response from Cannon, stating in relevant part

15  that Cannon and defendant Padilla, the Medical Director, had reviewed plaintiff's medical records

16  and that plaintiff's request for treatment was denied because "CHS does not treat Hepatitis C and

17  does not have a specific contract with any provider to treat our Hepatitis patients."  Id. at ¶ 19 &

18  Ex. J.  Plaintiff was advised of the option to secure treatment with an outside physician at his own

19  expense.  Id.  Due to not receiving medical treatment for cirrhosis and hepatitis C, plaintiff

20  suffered severe abdominal pain, liver pain, diarrhea, fatty liver, and increased risk of premature

21  death.  Id. at ¶¶ 19−20, 22, 27, 30.

22      Plaintiff alleges that Sheriff Jones implemented the policy of denying treatment to inmates

23  suffering from hepatitis C and that as the Sheriff of Sacramento County, Jones is the "ultimate

24  authority" and no polices are made without his knowledge and approval.  Id. at ¶ 21.

25      Plaintiff seeks damages and states that defendants are sued in both their individual and

26  ////

27

28  [1]  Because Cannon and Maness were dismissed pursuant to the court's September 18, 2013 order, the first amended complaint proceeds against defendants Padilla and Jones only.

3

1  official capacities.[2]  Id. at ¶¶ 6−9, 32.

2  <u>ALLEGATIONS OF THE PROPOSED AMENDED COMPLAINT</u>[3]

3       In the proposed amended complaint ("SAC"), ECF No. 65, plaintiff re-alleges the

4  majority of the allegations contained in the first amended complaint ("FAC"), with one notable

5  distinction.  In the SAC, plaintiff alleges that Correctional Health Services *does* have a policy of

6  providing treatment for inmates suffering from hepatitis C and that grievance coordinator Kelly

7  Cannon lied when she stated, in response to plaintiff's grievances, that CHS does not treat

8  hepatitis C.[4]  Plaintiff alleges that Dr. Padilla knew of Cannon's untruthful statement and relied

9  on it in denying plaintiff Hepatitis C treatment.  Sheriff Jones and Maness, the division

10  commander, were also aware of Cannon's misstatement of the policy, but failed to correct her lie.

11  Plaintiff also appears to allege that defendants allowed Cannon, who is not a medical

12  professional, to make a medical decision regarding his treatment, and that defendants "willfully

13  turn[ed] a blind eye" to the violation of plaintiff's rights.  Id. at ¶ 24.  Plaintiff contends that based

14  on this "new evidence," Cannon and Maness should be re-joined as defendants.

15  <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

16  I.     Defendants' Argument

17       Defendants contend that they are entitled to judgment as a matter of law on both plaintiff's

18  deliberate indifference claim and Monell claim.

19       As to the deliberate indifference claim, defendants contend that SCMJ has an express

20  written policy regarding hepatitis C ("HCV") treatment for inmates and that plaintiff was

21  evaluated and treated pursuant to this policy.  ECF No. 66 at 6.  Dr. Padilla reviewed plaintiff's

22  medical records and determined based on his medical judgment that plaintiff was not a candidate

23  for HCV treatment due to the presence of several contraindications to therapy.  Id. at 9, 11.

24
_____

25  [2]  Pursuant to the court's September 18, 2013 order, the FAC proceeds against Padilla in both his
    individual and official capacity and against Jones in his official capacity only.

26  [3]  The court does not consider the allegations contained in the proposed amended complaint when
    evaluating defendants' motion for summary judgment, but includes them here to provide context

27  for the arguments plaintiff makes in his opposition to defendants' summary judgment motion.
    [4]  Plaintiff explains that he became aware of this policy in August 2014 while conducting

28  discovery.

Specifically, the policy provides that while "[p]atients who are positive for Hepatitis C will be treated . . . according to eligibility criteria established by the [National Health Institute]," "[p]atients who have absolute contraindications will not be referred for treatment." Id. at 7. According to the policy, "poorly controlled diabetes" is an absolute contraindication for treatment. Id. In addition, current use of alcohol or drugs is listed as a contraindication that would require an assessment for individualized treatment and eligibility. Id. Because Dr. Padilla determined that plaintiff's diabetes was poorly controlled and that plaintiff was continuing to abuse alcohol, Padilla concluded that plaintiff was ineligible for HCV treatment.

Defendants submit a number of plaintiff's lab test results in support of Dr. Padilla's conclusion that plaintiff's diabetes was uncontrolled and that plaintiff was continuing to abuse alcohol. With respect to plaintiff's claim that he was denied treatment for cirrhosis, defendants submit documentation indicating that when plaintiff began having symptoms that he believed were caused by HCV, Correctional Health Services began plaintiff on Lactulose for treatment of his cirrhosis. However, plaintiff subsequently requested that the Lactulose be discontinued. ECF No. 66 at 8.

Defendants contend that plaintiff's claim amounts to nothing more than an alleged difference of opinion concerning the appropriate course of medical treatment, which is insufficient to establish deliberate indifference. ECF No. 66 at 13. Defendants argue that while they have produced evidence that Dr. Padilla relied on his medical judgment in determining that plaintiff was not a candidate for HCV therapy based on his assessment that plaintiff's diabetes was uncontrolled, plaintiff has failed to produce evidence that Padilla's actions or failures to act were in conscious disregard of an excessive risk to plaintiff's health or were medically unacceptable under the circumstances. Id. at 13-14. Defendants assert that because Dr. Padilla made a reasoned medical decision based on plaintiff's test results and medical history, Padilla was not deliberately indifferent as a matter of law and defendants are entitled to summary judgment on this claim. Id. at 14-15.

With respect to the Monell claim, defendants move for summary judgment on the grounds that plaintiff has not established an underlying constitutional violation and therefore cannot

prevail on his claim.  ECF No. 66 at 15.  Even assuming a constitutional violation, defendants

assert that plaintiff has failed to produce evidence that SCMJ had a policy or custom of not

treating inmates with hepatitis C, particularly in light of SCMJ's express written policy regarding

HCV treatment and the fact that plaintiff was treated according to this policy.  Id. at 16.

Defendants further contend that plaintiff cannot identify an official with policy making authority

who deprived plaintiff of HCV or cirrhosis treatment and that to the extent plaintiff alleges that

grievance coordinator Cannon caused plaintiff to be denied treatment, plaintiff has produced no

evidence indicating that she had control over his medical care.  Id. at 17.  Accordingly,

defendants assert that summary judgment is appropriate because plaintiff has failed to establish

the essential elements of a Monell claim.

II.    Plaintiff's Opposition

Plaintiff submitted a memorandum in opposition to defendants' summary judgment

motion, ECF No. 73 at 1-58, as well as a statement of "Genuine Disputed Facts" in support of his

opposition, id. at 59-78, in which he makes an effort to provide citations to the record in support

of his asserted disputed facts.  He also attaches a number of exhibits to his opposition and has

filed a supplemental declaration, ECF No. 76,  in which he explains the relevance of the attached

exhibits.

It is well-established that the pleadings of pro se litigants are held to "less stringent

standards than formal pleadings drafted by lawyers."  Haines v. Kerner, 404 U.S. 519, 520 (1972)

(per curiam).  Nevertheless, "[p]ro se litigants must follow the same rules of procedure that

govern other litigants."  King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987), overruled on another

ground by Lacey v. Maricopa County, 693 F.3d 896 (9th Cir. 2012) (en banc).  However, the

unrepresented prisoners' choice to proceed without counsel "is less than voluntary" and they are

subject to the "handicaps . . . detention necessarily imposes upon a litigant," such as "limited

access to legal materials" as well as "sources of proof."  Jacobsen v. Filler, 790 F.2d 1362,

1364-65 & n.4 (9th Cir. 1986).  Inmate litigants, therefore, should not be held to a standard of

"strict literalness" with respect to the requirements of the summary judgment rule.  Id.

////

The court is mindful of the Ninth Circuit's more overarching caution in this context, as noted above, that district courts are to "construe liberally motion papers and pleadings filed by pro se inmates and . . . avoid applying summary judgment rules strictly." Ponder, 611 F.3d at 1150.  Accordingly, the court considers the record before it in its entirety despite plaintiff's failure to be in strict compliance with the applicable rules.  However, only those assertions in the opposition which have evidentiary support will be considered.

Plaintiff sets forth two primary arguments in opposition to defendants' summary judgment motion.  First, plaintiff asserts that there is a dispute of material fact as to whether plaintiff was eligible for HCV treatment.  Specifically, plaintiff claims that a prescription from another doctor shows he was eligible for HCV therapy, that his glucose test results and medical records show that his diabetes was controlled or at its goal, and that there is a factual dispute as to whether plaintiff was abusing alcohol.  Plaintiff's second argument is that defendants did not rely on plaintiff's medical history or test results at all in denying him treatment; instead, defendants denied plaintiff treatment because the grievance counselor (Cannon) stated in response to plaintiff's grievances that CHS does not provide treatment for hepatitis C.  Plaintiff contends that because Cannon's statement was the only reason he was ever given for being denied HCV treatment, Cannon's statement must have been the reason he did not receive treatment.

Plaintiff asserts that Dr. Padilla was both aware of plaintiff's serious medical need for treatment for hepatitis C and cirrhosis, and that Padilla acted in conscious disregard of this need.  Plaintiff asserts that Dr. Padilla was subjectively aware of plaintiff's need for treatment because Padilla reviewed plaintiff's medical records and therefore understood that HCV treatment was necessary to prevent further injuries to plaintiff.  Id. at 35.  Despite this knowledge, Padilla failed to respond reasonably to plaintiff's serious medical needs, intentionally interfered with the treatment prescribed by another doctor, and deliberately tried to deceive plaintiff into thinking that he could not receive treatment for HCV while incarcerated at SCMJ.  Id. at 36, 38.  Plaintiff asserts that his claim is not based on a difference of medical opinion concerning treatment options, because he was never treated for HCV.  Plaintiff states that he "may have been monitored or evaluated [for HCV] but never treated."  Id. at 41.

1    With respect to his Monell claim, plaintiff alleges that in denying plaintiff treatment,

2    defendants instituted a policy or custom that was contrary to their established administrative

3    policy regarding hepatitis C treatment and that this policy or custom of non-treatment was the

4    moving force behind his injuries.  Id.  In other words, plaintiff appears to allege that defendants'

5    failure to treat plaintiff's serious medical needs was a result of a custom of disregarding their own

6    written policy, which expressly provided for treatment of inmates with hepatitis C.  Id. at 50-52.

7        III.    Defendants' Reply

8    In reply, defendants emphasize that the issue on summary judgment is not what the most

9    appropriate course of treatment for plaintiff was, but whether defendants' "failure to timely give a

10   certain type of treatment was, in essence, criminally reckless."  ECF No. 74 at 3.  Defendants

11   filed formal objections to the evidence offered by plaintiff in opposition to defendants' summary

12   judgment motion, ECF No. 74-2, and assert that plaintiff has failed to produce any competent

13   evidence that contraindications to HCV therapy were not present, that plaintiff's diabetes was

14   well-controlled, or that plaintiff's elevated GGT levels were not due to continuing alcohol abuse.

15   Id.  Defendants further assert that in cases involving complex medical issues where the plaintiff

16   contests the type of treatment he received, expert opinion will almost always be necessary to

17   establish deliberate indifference, yet plaintiff failed to provide any expert testimony.  Id. at 2-3.

18   Defendants contend that plaintiff is not qualified to offer an opinion regarding his eligibility for

19   HCV treatment and that plaintiff's improper lay opinion is insufficient to establish a factual

20   dispute as to whether plaintiff was eligible for such treatment.  Id. at 3-5.

21   As to the Monell claim, defendants assert that Cannon's two statements that "CHS does

22   not treat Hepatitis C" are insufficient by themselves to establish the existence of a long-standing

23   policy or custom of non-treatment, particularly in light of the fact that plaintiff was treated and

24   monitored according to SCMJ's express written treatment policy.  ECF No. 74 at 7-8.  While

25   plaintiff alleges that Cannon caused plaintiff to be denied HCV treatment, defendants contend

26   that Cannon is a grievance coordinator and not a policymaker or medical professional.  Id. at 8.

27   ////

28   ////

8

IV.     Legal Standard for Rule 56 (Summary Judgment) Motions

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Securities Litigation), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admission, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

When the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the nonmoving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  See Celotex, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment ... is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

9

admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11.  Moreover, "[a] Plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence."  Lopez v. Smith, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc).[5]

The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assoc., 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U .S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party."  Walls v. Central Costa County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011) (per curiam).  It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. … Where the record taken as a whole could not lead a rational trier of

////

_____

[5]  Plaintiff filed a verified First Amended Complaint in this case.  See ECF No. 32.

1  fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at

2  587 (citation omitted).

3       In applying these rules, district courts must "construe liberally motion papers and

4  pleadings filed by pro se inmates and … avoid applying summary judgment rules strictly."

5  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).  However, "[if] a party fails to properly

6  support an assertion of fact or fails to properly address another party's assertion of fact, as

7  required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion

8  …." Fed. R. Civ. P. 56(e)(2).

9       V.     Undisputed Material Facts

10      The court finds the following facts to be undisputed:[6]

11  •  Defendant Padilla is currently the Medical Director for the Sacramento County Main Jail

12     ("SCMJ") and has been in that position since 2010.  Declaration of Dr. Robert Padilla
       ("Padilla Decl.") (ECF No. 66-5) at 1, ¶ 1.

13
   •  As Medical Director, Padilla oversees healthcare at SCMJ.  Id. ¶ 2.
14

15  •  One of Padilla's responsibilities as Medical Director is to collaborate with other
       individuals and several committees on policies for the administration of health services to

16     inmates at SCMJ and to adhere to those policies. Id. at ¶ 3.

17  •  At all times relevant to the complaint, plaintiff suffered from diabetes mellitus.
       Defendants' Undisputed Facts ("Facts") (ECF No. 66-2) at ¶ 1.[7]

18
   •  In 2002, plaintiff was diagnosed with hepatitis C ("HCV"), but was not prescribed
19     medical treatment.  Facts ¶ 2.

20
   •  On April 11, 2005, a liver biopsy revealed that plaintiff had developed "cirrhosis of the
21     liver with stage (4) fibrous."  Plaintiff was not prescribed treatment at that time.  Facts ¶ 3.

22
   •  On September 18, 2006, while incarcerated at San Quentin State Prison, plaintiff was seen
23     by Dr. Lopin.  Facts ¶ 4.  The record indicates that Dr. Lopin wrote the following
       assessment/plan for plaintiff:
24

25  [6]  In his opposition papers, plaintiff purports to "dispute" the majority of the facts asserted in
   defendants' statement of undisputed facts.  However, is clear from plaintiff's responses that he

26  does not actually dispute each fact, but rather disagrees with how particular facts should be
   interpreted or argues that the fact does not entitle defendants to summary judgment.

27  [7]  Where, as here, defendant's Undisputed Facts are supported by the submitted evidence, and not
   seriously contested by plaintiff, the court cites only to the relevant paragraph of defendant's

28  Undisputed Facts.

1.  Cirrhosis.  Continued monitoring.

2.  Hepatitis C virus positive, hepatitis B virus positive.  Stage IV liver disease.  The patient was seen by infectious disease on 6/26/2006, and therapy was recommended for the hepatitis if the patient could achieve better control of his diabetes; i.e., bringing the A1C to approximately 6.5.

3.  Diabetes mellitus, fair to poor control secondary to compliance issues.  The patient takes insulin NPH 12 units b.i.d. and regular 6 units b.i.d.  He has only been receiving his evening dose on a regular basis.  The morning dose he receives 3 days a week, Fridays, Saturdays, and Sundays, because he does not work.  His work schedule Monday through Thursday is interfering with his receiving medications in the morning on those days.  The patient states that, early in the mornings, the drugs are not available, and he needs to get to work.  At this time, the patient is going to wait at the recommendation of this doctor and others who have preceded me until the medication is available.  Ideally, this patient will comply fully with the insulin regimen, bring the A1C down, and then we can proceed to therapy for his hepatitis.

Facts ¶ 4; First Amended Complaint ("FAC") (ECF No. 32) Exh. D at 22.

- Plaintiff did not receive any treatment for HCV from 2002-2009.  Facts at 3, ¶ 5.

- Plaintiff arrived at Sacramento County Main Jail on or about January 20, 2009.  Facts at 4, ¶ 8.  He remained incarcerated at SCMJ until March 15, 2012.  Plaintiff's Declaration (ECF No. 73) Exh. P at 121.

- Upon plaintiff's arrival at SCMJ, the medical staff noted that plaintiff suffered from the following conditions: bipolar disorder, antisocial personality disorder, insulin dependent diabetes mellitus, hypertension, hepatitis C with cirrhosis, and gastroesophageal reflux disease.  Facts at 4, ¶ 9.  Liver function tests and tests for plaintiff's diabetes were ordered and completed.  Id. at ¶ 10.

- When plaintiff first arrived at SCMJ in 2009, he was not having any difficulties with hepatitis C.  Plaintiff states that he did not start having symptoms until 2011.  Plaintiff's Deposition ("Deposition") (ECF No. 66-4) at 6:10-17.

- The record indicates that on or about March 1, 2011, plaintiff filed a health services "kite" requesting to see a doctor about treatment for liver disease because he was having severe stomach pain and diarrhea.  Plaintiff states in the document that it is his second health service kite.  FAC Exh. E at 25.

- The record indicates that on June 27, 2011, plaintiff submitted an inmate grievance alleging that he had been asking for hepatitis C treatment for two and a half years, but was constantly refused treatment and told by medical staff that they do not treat his type of illnesses.  He states in the grievance that he has been having complications and that he has

12

had blood drawn, but has not received any of the results.  FAC Exh. F at 27.[8]

- On or about June 27, 2011, Correctional Health Services began plaintiff on Lactulose for his cirrhosis.  Padilla Decl. at 4, ¶ 13.

- On July 29, 2011 and July 30, 2011, plaintiff refused to take his Lactulose and on July 31, 2011 he asked that it be discontinued altogether.  Facts at 6, ¶ 18.

- The record indicates that on or about August 16, 2011, plaintiff submitted another inmate grievance regarding his lack of hepatitis C and cirrhosis treatment.  He states in the grievance that his June 17, 2011 grievance had not been responded to.  FAC Exh. G at 29.

- On or about September 2, 2011, Kelly Cannon, the Patient Grievance Coordinator, responded to plaintiff's June 27, 2011 and August 16, 2011 grievances.  The record reveals that Cannon responded to plaintiff, in relevant part, as follows:

> Correctional Health does not treat Hepatitis C.  You were being treated for your Cirrhosis; on 7/30/11 you refused the Lactulose and requested that it be discontinued.  If you want to start back on Lactulose, you will need to sign up for Nurse sick call and request it.

> Lab results are not typically reported to the patient unless they are not within normal limits or something is newly diagnosed.  You can take that as, no news is good news and that your labs are normal for you and that there have been no significant changes.  If you do not want to accept that, you can sign up for the nurse sick call and ask the Nurse to go over the results with you.

FAC at 31.

- The record indicates that on or about September 13, 2011, plaintiff wrote a letter addressed to "Captain, Erik Maness" explaining that plaintiff only refused to take Lactulose because he was not told that it was to treat his cirrhosis and that had he been properly informed, he would not have rejected it.  He also wrote that "Kelly Cannon said that correctional health does not treat Hepatitis C, which is deliberate indifference to [his] serious medical needs," and that he "know[s] for a fact that you have contracts with outside medical providers."  FAC Exh. I at 33.

- On September 22, 2011, Cannon replied to plaintiff's September 13, 2011 letter addressed to Maness.  The record indicates that Cannon responded as follows:

> In response to your appeal dated 9-3-11, I have reviewed your appeal and your medical file with the Medical Director.  The review indicates the following: You are welcome to send in a pink medical kite and request to start back on the Lactulose if you want to restart treatment.  CHS does not treat Hepatitis C and does not have a specific contract with any provider to treat our Hepatitis patients.

---

[8]  Defendants do not "admit" any facts with respect to plaintiff's grievances or health services kite but do not seriously dispute that these documents were filed.

1   FAC at 35.  The letter also informed plaintiff that he could seek hepatitis C treatment from
    a physician in the community at his own expense.  Id.

2

3   • Plaintiff did not seek a community physician to treat his HCV.  Facts at 7, ¶ 20.

    A.  SCMJ's Hepatitis C Treatment Policy

4

5   • Sacramento County Main Jail has an express written policy that defines protocols and
    procedures for treatment of inmate-patients diagnosed with or suspected to suffer from

6   hepatitis C.  The policy is entitled Administrative Policy 1714 and was adopted in 2006.
    Administrative Policy 1714 ("Policy 1714") follows the guidelines set forth by the

7   National Institute of Health (NIH) and represents medically accepted practices at the time
    the policy is in place.  Facts ¶ 6.

8

9   • Policy 1714 provides that:

10          Hepatitis C is a serious and potentially life threatening chronic
            disease.  Patients who are positive for hepatitis C will be treated

11          with interferon and ribavirin according to eligibility criteria
            established by NIH and under the consultative care of a

12          gastroenterologist.

13          []

14          Patients who have absolute contraindications for treatment will not
            be referred for treatment.

15
            Patients who are not eligible for interferon treatment will be

16          followed regularly every 3-6 months and informed of their current
            status.

17
    ECF No. 65 at 48; FAC Exh. F at 93.

18

19  • A "contraindication" is a condition or factor that serves as a reason to withhold certain
    medical treatment.  Padilla Decl. at 4, ¶ 17.

20

21  • Under the heading "PROCEDURE," Policy 1714 provides that:

22          Persons suspected of being positive for Hepatitis C by history or
            known risk factors should be screened.

23          If positive, liver function tests, immune status to Hepatitis A and B,
            HIV and viral load should be determined.   Other co-morbid

24          conditions or potential contraindications should be determined,
            such as disease, depression, pregnancy, thyroid disease.

25
            History of substance abuse is not an absolute contraindication to

26          treatment depending on the severity of disease and length of time
            away from drugs or alcohol.

27

28  • Policy 1714 further provides that "[t]herapy is currently contraindicated for . . . [s]evere
    concurrent disease: [s]evere HTN, heart failure, CAD, poorly controlled diabetes, COPD."

                                        14

ECF No. 65 at 50; FAC Exh. F at 95.

- Policy 1714 states that HCV therapy must be individualized for "current users (within 6 months of last use) or drugs or alcohol."  ECF No. 65 at 49; FAC Exh. F at 94.

- In the "DISCUSSION" section of Policy 1741, there is a notation that:

> Patients with recent (less than 6 months) histories of drug and alcohol abuse are difficult to assess for severity of illness and most specialists recommend waiting until the effects on the liver are solely from the virus.  However, if the status of the patient is deteriorating, the six month "clean and sober" period may be waived as an eligibility criterion.

ECF No. 65 at 47-48; ECF No. 73 at 92-93.

B.  Dr. Padilla's Review

- Dr. Padilla declares that he reviewed plaintiff medical records to evaluate whether or not plaintiff was eligible to receive HCV antiviral therapy.  Padilla Decl. at 4, ¶ 16.

- Based on Dr. Padilla's own medical training and experience, his review of plaintiff's medical history, including lab testing done of plaintiff's liver function, glucose levels over time, daily glucose levels, and GGT levels, and in light of the guidelines set for in Policy 1714, Dr. Padilla determined that HCV treatment was inappropriate for plaintiff based on the presence of several contraindications to HCV therapy.  Padilla Decl. at 4, ¶ 16.

- Dr. Padilla declares that pursuant to Policy 1714 and the NIH guidelines in place at the time, "Plaintiff's uncontrolled diabetes was an absolute contraindication to HCV antiviral therapy and thus, plaintiff was ineligible [for treatment]."  Padilla Decl. at 4, ¶ 18.

- Dr. Padilla declares that plaintiff was not eligible for HCV therapy "due to the presence of another contraindication to therapy; i.e. that several liver function tests revealed that any negative effect to plaintiff's liver was attributable to continuing alcoholism as opposed to Hepatitis C."  Padilla Decl. at 6, ¶ 43.

C.  Plaintiff's Lab Tests

- As part of the management and monitoring of plaintiff's chronic care condition (diabetes mellitus) and his reported HCV and cirrhosis, SCMJ tested plaintiff's glucose and liver function frequently.  Padilla Decl. at 3, ¶ 9.

    1.  Glucose Testing

- For management of his diabetes, plaintiff received daily glucose testing.  Padilla Decl. at 3, ¶ 11.

- There are two ways to test glucose levels.  A test on Glycohemoglobin reflects glucose

15

levels over time, while the finger stick method measures glucose levels at a particular point in time.  Padilla Decl. at 5, ¶ 19.

i.   Glycohemoglobin Tests (A1C Tests)

- Glycohemoglobin tests reflect glucose level over time because Glycohemoglobin levels increase as glucose levels remain high for an extended period of time.  Padilla Decl. at 5, ¶ 19.

- Plaintiff's Glycohemoglobin test results from his time at SCMJ are reflected on his lab reports under the heading "Hemoglobin 1AC immunoassay" (hereafter "A1C").

- The normal range for Glycohemoglobin is 4.4%-6.6%.  Padilla Decl. at 5, ¶ 19.

- Dr. Padilla declares that in order to be eligible for HCV treatment, plaintiff's A1C level needed to be at 6.5%.[9]  Padilla Decl. at 5, ¶ 19.

- Plaintiff's test results reveal the following:

  o   On June 4, 2009, plaintiff's A1C level was at 9.2%.  ECF No. 66-6 Exh. F at 107.

  o   On November 23, 2009, plaintiff's A1C level was at 8.7%.[10]  Padilla Decl. at 5, ¶ 22.

  o   On August 10, 2011, plaintiff's A1C level was at 8.8%.  ECF No. 66-6 Exh. H at 110.

  o   On March 14, 2012, plaintiff's A1C level was at 10%. ECF No. 66-6 Exh. I at 114.

ii.   Finger Stick Tests

- Plaintiff received finger stick glucose testing twice daily while incarcerated at SCMJ.  The results of plaintiff's finger stick tests are reflected in the "Diabetic Flow Sheets."  Padilla Decl. at 3, ¶ 11; 5, ¶ 19.

- To be in an appropriate range, plaintiff's glucose level should have been between 65-99 ml/dL.  Padilla Decl. at 5, ¶ 25.

- Plaintiff's test results show the following glucose levels:[11]

  o   January 21, 2009: 208 ml/dL.  ECF No. 66-6 Exh. C.

---

[9]  This fact is undisputed to the extent that plaintiff acknowledges that Padilla used 6.5% as an eligibility criterion.
[10]  Defendants purport to attach the November 23, 2009 test results as "Exhibit G," but nothing is attached.  See ECF No. 66-6 at 108.
[11]  These are not the only results available, see ECF No. 66-6 at 18-103, but are the results that defendants cite to.

16

1
2
3
4
5
6
7
8
9
10

- o  January 22, 2009: 112 ml/dL.  Id.
- o  April 23, 2009: 40 ml/dL.  Id. at Exh. J.
- o  June 4, 2009: 250 ml/dL.[12]  Padilla Decl. at 5, ¶ 29.
- o  October 5, 2009: 77 ml/dL.  ECF No. 66-6 Exh. K.
- o  November 3, 2009: 209 ml/dL.  Id. at Exh. L.
- o  November 23, 2009: 232 ml/dL.[13]  Padilla Decl. at 5, ¶ 7.
- o  December 1, 2009: 248 ml/dL.  ECF No. 66-6 Exh. M.
- o  August 4, 2010: 251 ml/dL.[14]  Id. at Exh. N.
- o  December 10, 2010: 251 ml/dL.[15]  Id. at Exh. O.
- o  May 31, 2011:299 ml/dL.  Id. at Exh. P.
- o  August 10, 2011: 278 ml/dL.[16]  Id. at Exh. H.
- o  August 17, 2011: 354 ml/dL.  Id. at Exh. Q.
- o  September 16, 2011: 220 ml/dL.  Id. at Exh. R.
- o  September 22, 2011: 179 ml/dL.  Id. at Exh. S.
- o  December 12, 2011: 253 ml/dL.  Id. at Exh. T.
- o  March 14, 2012: 371 ml/dL.  Id. at Exh. I.

11
12

- Dr. Padilla declares that he relied on plaintiff's glucose test results, among other factors, in determining that plaintiff's uncontrolled diabetes rendered plaintiff ineligible for HCV antiviral therapy.  See Padilla Decl. at 4, ¶¶ 16, 18.

13

    2.  Liver Tests

14
15
16

- SCMJ tested plaintiff's liver function frequently.  Padilla Decl. at 3, ¶ 9.  Plaintiff received liver testing on the following dates: January 21, 2009; January 22, 2009; April 23, 2009; October 5, 2009; November 3, 2009; December 1, 2009; August 4, 2010; December 9, 2010; May 31, 2011; August 10, 2011; August 17, 2011; September 16, 2011; September 22, 2011; December 12, 2011; March 14, 2012.  Id. ¶ 12; Facts ¶ 14.

17
18

- To test plaintiff's liver function, SCMJ tested plaintiff's levels of alanine aminotransferase ("ALT"), bilirubin, and aspartate aminotransferase ("AST").  Padilla Decl. at 3, ¶ 9.

19

- Both ALT and AST levels are reliable tests for liver damage.  Id.

20

- When the liver is damaged, it releases ALT levels into the bloodstream, which makes the ALT levels go up.  Id.

21
22

- Most increases in ALT levels are caused by liver damage.  Id.  The ALT test is typically done with other tests that check for liver damage, including AST, alkaline phosphatase ("ALP"), lactate dehydrogenase ("LDH"), and bilirubin.  Id.

23

- Dr. Padilla declares that in determining that HCV antiviral therapy was inappropriate for

24
25
26
27
28

[12]  This lab report indicates that the "mean plasma glucose" level was 250 ml/dL.
[13]  This test result is listed as "Exhibit G" but is not attached.
[14]  Dr. Padilla's declaration states that the glucose level on August 4, 2010 was 340 ml/dL, but the attached lab report lists the glucose level as 251 ml/dL.
[15]  Dr. Padilla's declaration lists the date of this test as December 1, 2010, but the test itself is dated December 10, 2010.
[16]  The lab report lists the "mean glucose level" as 236 ml,dL, but lists the "glucose" level as 278 ml/dL.

plaintiff, Padilla relied in part on lab testing done of plaintiff's liver function.  See Padilla Decl. at 4, ¶ 16.

### 3. Glucose Tolerance Tests (GGT Tests)

- Following plaintiff's request for HCV treatment, several Glucose Tolerance Tests (GGT) were performed.  Padilla Decl. at 6, ¶ 44.  GGT refers to gamma-glutamyl transferase (GGT).  Id.

- A GGT test may be used to determine the cause of elevated levels of ALP.  Padilla Decl. at 6, ¶ 44.  See also Plaintiff's Opposition (ECF No. 73) Exh. C at 84.

- GGT tests can be used to screen for chronic alcohol abuse (it will elevated in about 75% of chronic drinkers) and to monitor for chronic alcohol use/and or abuse in people who are receiving treatment for alcoholism or alcoholic hepatitis.  Padilla Decl. at 6, ¶ 44.  See also Plaintiff's Opposition (ECF No. 73) Exh. C at 84.

- Plaintiff's GGT was tested on May 31, 2011.  He had a GGT level of 84 U/L, just within the upper limit of the reference range.  Padilla Declr. at 6, ¶ 8; Exh. P at 135.

- The record indicates that the lab report lists the reference range for GGT as "3-85 U/L."  See Padilla Declr. Exh. P, R, T, I.

- On September 16, 2011, plaintiff's GGT level was 139 U/L, "greatly exceeding the reference range limits."  Padilla Decl. at 6, ¶ 46; Exh. R.

- On December 12, 2012, plaintiff's GGT level was 199 U/L.  Padilla Declr. at 6, ¶ 47; Exh. T.

- On March 14, 2012, plaintiff's GGT level was 417 U/L, "over five times the limit of the upper reference range."  Padilla Decl. at 6, ¶ 48; Exh. I.

- Dr. Padilla declares that he determined that that plaintiff's GGT tests "revealed that the negative effects to Plaintiff's liver were more attributable to alcoholism than Hepatitis C and that because Plaintiff was continuing to abuse alcohol, he could not be compliant with the requirements for HCV treatment or a liver transplant."  Padilla Decl. at 6-7, ¶¶ 43, 49, 51.

- Padilla declares that "[e]ach time [he] evaluated Plaintiff's condition [he] determined, under the circumstances discussed above, that HCV treatment was inappropriate for Plaintiff at that time because based on [Padilla's] medical judgment and opinion, Plaintiff was not eligible for treatment based on several absolute contraindications to treatment including poorly controlled diabetes and the presence of continued alcohol abuse."  Padilla Decl. at 7 ¶ 52.

////
////
////
////

18

VI.     Plaintiff's Evidence

Plaintiff submits the following additional evidence in opposition to defendants' motion for summary judgment:

- On January 23, 2009, Dr. Roof signed an order which stated the following in regards to plaintiff: "Medical to resume treatment of diabetes mellitus, hypertension, GERD, cirrhosis, hepatitis C, Angina." ECF No. 73 Exh. B at 82.

- A "Medical Record Treatment Sheet" from CHS dated November 3, 2009 states: "DM @ goal." ECF No. 73 Exh. A at 80.

- Plaintiff's diabetic flow sheets contain some test results showing that plaintiff's glucose level was within the normal range. ECF No. 73 Exh. U1-U4 at 136-39.

- The California Department of Corrections and Rehabilitation's "Inmate Medical Services Policies and Procedures" for Hepatitis C, revised in 2008, states: "EXCLUSION CRITERIA FOR HCV TREATMENT . . . Medical conditions. Patients with poorly controlled . . . diabetes mellitus (hemoglobin A1C > 8.5%). ECF No. 73 Exh. E at 90.

- On May 22, 2013, plaintiff had an A1C test done showing that his A1C levels were at 8.3%. FAC at 141.

- GGT tests do not indicate the cause of a patient's liver damage, but show only that the liver is damaged. ECF No. 73 Exh. C at 84-85.

- Plaintiff has not had a drink of alcohol since 1999. Plaintiff's Declaration (ECF No. 73) Exh. P at 122.

- Plaintiff was not told that Lactulose was for cirrhosis treatment. Plaintiff's Declaration (ECF No. 73) Exh. P at 122.

- Plaintiff has never met Dr. Padilla or been examined by him. Plaintiff's Declaration (ECF No. 73) Exh. P at 122.

VII.    Legal Standards Governing Eighth Amendment Claim

In order to state a §1983 claim for violation of the Eighth Amendment based on inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). To prevail, plaintiff must show both that his medical needs were objectively serious, and that defendants possessed a sufficiently culpable state of mind. Wilson v. Seiter, 501 U.S. 294, 299 (1991); McKinney v. Anderson, 959 F.2d 853, 854 (9th Cir. 1992) (on remand). The requisite

19

1    state of mind for a medical claim is "deliberate indifference."  Hudson v. McMillian, 503 U.S. 1,

2    5 (1992).

3        A serious medical need exists if the failure to treat a prisoner's condition could result in

4    further significant injury or the unnecessary and wanton infliction of pain.  Indications that a

5    prisoner has a serious need for medical treatment are the following:  the existence of an injury

6    that a reasonable doctor or patient would find important and worthy of comment or treatment; the

7    presence of a medical condition that significantly affects an individual's daily activities; or the

8    existence of chronic and substantial pain.  See, e.g., Wood v. Housewright, 900 F.2d 1332, 1337-

9    41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01 (9th Cir. 1989).

10   McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, WMX

11   Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

12       In Farmer v. Brennan, 511 U.S. 825 (1994), the Supreme Court established a very

13   demanding standard for "deliberate indifference."  Negligence is insufficient.  Farmer, 511 U.S.

14   at 835.  Even civil recklessness (failure to act in the face of an unjustifiably high risk of harm

15   which is so obvious that it should be known) is insufficient to establish an Eighth Amendment

16   violation.  Id. at 836-37.  It not enough that a reasonable person would have known of the risk or

17   that a defendant should have known of the risk.  Id. at 842.  Rather, deliberate indifference is

18   established only where the defendant subjectively "knows of and disregards an excessive risk to

19   inmate health and safety."  Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) (internal

20   citation omitted).  Deliberate indifference can be established "by showing (a) a purposeful act or

21   failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the

22   indifference."  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations omitted).

23       A physician need not fail to treat an inmate altogether in order to violate that inmate's

24   Eighth Amendment rights.  Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir.1989).  A

25   failure to competently treat a serious medical condition, even if some treatment is prescribed, may

26   constitute deliberate indifference in a particular case.  Id.  However, "[a] difference of opinion

27   between a physician and the prisoner – or between medical professionals – concerning what

28   medical care is appropriate does not [without more] amount to deliberate of indifference."  Snow

                                                    20

v. McDaniel, 681 F.3d 978, 987 (9th Cir. 2012), overruled on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1083 (9th Cir. 2014).  To establish that the difference of opinion rises to the level of deliberate indifference, a prisoner must show that the defendant's chosen course of treatment was medically unacceptable and in conscious disregard of an excessive risk to plaintiff's health. Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).  Furthermore, in cases involving complex medical issues where plaintiff contests the type of treatment he received, expert opinion will almost always be necessary to establish the necessary level of deliberate indifference. Hutchinson v. United States, 838 F.2d 390 (9th Cir.1988).

VIII.    Analysis of Eighth Amendment Claim[17]

There is no dispute in this case that plaintiff's medical needs were serious – during all periods relevant to the complaint, plaintiff suffered from cirrhosis of the liver and hepatitis C, a serious and potentially life-threatening chronic condition.  See McGuckin, 974 F.2d 1059-60. Accordingly, the only issue is whether Dr. Padilla was deliberately indifferent to plaintiff's need for treatment of cirrhosis and hepatitis C.

Defendants' evidence establishes that plaintiff received Lactulose for treatment of his cirrhosis and that with respect to plaintiff's hepatitis C, Dr. Padilla made a reasoned medical decision based on his review of plaintiff's medical history and lab test results that plaintiff was ineligible for HCV therapy due to his poorly controlled diabetes and continuing alcohol abuse.

[17]  As established in this court's September 18, 2013 order, plaintiff was a pre-trial detainee at Sacramento County Main Jail in 2010 and 2011 and was convicted by a jury on January 31, 2012. ECF No. 45.  Persons who have been arrested, but not convicted of a crime, derive their rights from the due process clause of the Fourteenth Amendment, rather than from the Eighth Amendment's prohibition against cruel and unusual punishment.  See Gibson v. County of Washoe, Nev., 290 F.3d 1175, 1187 (9th Cir. 2002), cert. denied, 537 U.S. 1106 (2003).  Due process imposes, at a minimum, the same protections that the Eighth Amendment imposes: persons in custody have the established right not to have officials be deliberately indifferent to their serious medical needs.  Id.  Comparable standards apply, with Fourteenth Amendment analysis borrowing from Eighth Amendment standards.  Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998); Redman v. County of San Diego, 942 F.2d 1435, 1440-41 & n.7 (9th Cir. 1991) (discussing pre-trial detainees); Carnell v. Grimm, 74 F.3d 977, 979 (9th Cir. 1996) ("[D]ue process rights are at least as great as the Eighth Amendment protections available to a convicted prisoner.").  Thus, although plaintiff's rights are governed by the Fourteenth Amendment, the court may refer to the Eighth Amendment standard as a base reference for the minimal protections due.

1   This evidence supports defendants' claim that Dr. Padilla's conduct was medically acceptable

2   under the circumstances, and defendants have met their initial burden of demonstrating that there

3   is an absence of evidence to support plaintiff's claim that Padilla was deliberately indifferent to

4   plaintiff's need for treatment of cirrhosis and hepatitis C.  Accordingly, the burden shifts to

5   plaintiff as the non-moving party "to establish that a genuine issue as to any material fact actually

6   does exist."

7          Plaintiff argues that there is a material dispute of fact as to whether he was eligible for

8   HCV treatment and argues in the alternative that Dr. Padilla denied him HCV treatment not

9   because he was ineligible for treatment but because Cannon, the grievance coordinator, stated that

10  CHS does not treat hepatitis C.

11         To the extent plaintiff alleges that Dr. Padilla denied him treatment based on grievance

12  coordinator Cannon's misstatement of the applicable hepatitis C treatment policy, the court notes

13  that plaintiff's claim is not based on a difference of opinion between medical professionals or

14  between plaintiff and his doctor.  Rather, plaintiff's claim is that Dr. Padilla's decision to deny

15  him HCV treatment was not a medical decision.  However, this distinction does not help plaintiff.

16  Although he is adamant that he was denied treatment because of Cannon's statement that CHS

17  does not treat hepatitis C, plaintiff provides no evidence from which a reasonable trier of fact

18  could conclude that Dr. Padilla, the medical director, relied on Cannon's statement in denying

19  plaintiff HCV therapy.  Plaintiff argues repeatedly that he was never told he was ineligible for

20  treatment and that Cannon's statement must have been the reason he was denied treatment since it

21  was the only reason he was ever given for not receiving treatment.  However, this conclusory

22  allegation does not rebut defendants' sworn declaration that Dr. Padilla based his decision on his

23  own medical judgment and his review of plaintiff's lab results and medical history.  The fact that

24  plaintiff was not told he was ineligible for HCV treatment is certainly troubling, but it does not

25  permit the inference that Dr. Padilla made a decision to deny treatment based on the grievance

26  coordinator's response to an inmate appeal in which she misstated the treatment policy.  Because

27  a reasonable trier of fact could not conclude from plaintiff's evidence that Dr. Padilla relied on

28  ////

22

1    Cannon's statement in denying plaintiff treatment, plaintiff's argument here cannot defeat

2    defendants' motion for summary judgment.

3          The court now turns to plaintiff's argument that a genuine dispute of material fact exists as

4    to whether plaintiff was eligible for HCV treatment.  In his sworn declaration, Dr. Padilla

5    declares that he determined that plaintiff was ineligible for treatment based on several

6    contraindications for therapy – namely his uncontrolled diabetes and his continued abuse of

7    alcohol.  Plaintiff asserts that there is a dispute of fact as to whether his diabetes was "poorly

8    controlled" and as to whether plaintiff was continuing to abuse alcohol.  These issues are

9    significant because if plaintiff's evidence reveals a genuine dispute of fact as to whether Padilla's

10   decision to deny plaintiff HCV treatment was medically acceptable under the circumstances, then

11   defendants are not entitled to summary judgment on the deliberate indifference claim.  See

12   Jackson, 90 F.3d at 332.

13         1.  Dr. Roof's "Prescription"

14         Plaintiff initially asserts that he was prescribed HCV treatment in 2009 by Dr. Roof, and

15   that, contrary to Dr. Padilla's opinion, Dr. Roof's order shows that plaintiff was eligible for HCV

16   therapy.  In support of his argument, plaintiff submits a copy of a document entitled "Physician

17   Orders" dated November 23, 2009, allegedly signed by Dr. Roof, and contends that in this order,

18   Dr. Roof "prescribed" plaintiff HCV treatment.  See ECF No. 73 Exh. B at 82.  Defendants argue

19   that this "order" is inadmissible and that in any case the document is not a prescription for HCV

20   treatment, but rather discharge papers signed by Dr. Roof, a psychiatrist at UC Davis, transferring

21   plaintiff from the psychiatric department to SCMJ.  ECF No. 74 at 5.

22         Even assuming that the above document would be admissible at trial, the undersigned

23   finds that it is insufficient to raise a triable issue of fact as to whether plaintiff was eligible for

24   HCV treatment.  The purported "prescription" merely states "CHS orders: medical to resume

25   treatment of Diabetes Mellitus, Hypertension, GERD, Cirrhosis, Hepatitis C, Angina."  There is

26   no indication that the document is a prescription of any kind, much less for HCV antiviral

27   therapy.  Moreover, the fact that plaintiff had not already been receiving HCV therapy and the

28   document directs CHS to "*resume* treatment" (emphasis added) further supports the conclusion

23

1    that the document is not a prescription for a new treatment.  Furthermore, even if Dr. Roof had

2    found plaintiff eligible for HCV treatment in 2009, a mere difference of opinion between Dr.

3    Roof and Dr. Padilla as to whether plaintiff was eligible for HCV therapy would be insufficient to

4    form the basis of a deliberate indifference claim against Dr. Padilla.  See Snow, 681 F.3d at 987

5    (a difference of opinion between medical professionals concerning what medical care is

6    appropriate does not without more amount to deliberate indifference).

7            2.   Poorly Controlled Diabetes

8            Plaintiff next argues that his evidence establishes or at least creates a dispute of fact as to

9    whether his diabetes was controlled.  Plaintiff directs the court's attention to several lab tests in

10   which his glucose levels were "in range," as well as to other documents in his medical file that

11   indicate his diabetes was controlled or at its goal.

12              a.   Finger Stick Glucose Tests

13           In his declaration, Dr. Padilla opined that plaintiff's glucose levels, as measured by the

14   finger stick tests and reflected in the Diabetic Flow Sheets, needed to be between 65-99 ml/dL in

15   order for plaintiff to be eligible for HCV treatment.  In response, plaintiff first argues that one of

16   the glucose test results cited by defendants was within range and therefore does not support

17   Padilla's conclusion that plaintiff was ineligible for treatment.  ECF No. 73 at 23.  Specifically,

18   plaintiff's lab result on October 5, 2009 was 77 ml/dL and was therefore within the 65-99 ml/dL

19   range.  Plaintiff also submits copies of his Diabetic Flow Sheets covering the range of March

20   2009 through May 2009 and argues that they contain twenty-five test results in the mornings

21   alone that were within the appropriate range.  ECF No. 73 at 21.  However, plaintiff's evidence

22   does not rebut, and is actually consistent with, Padilla's conclusion that plaintiff's diabetes was

23   poorly controlled because it shows that not all of plaintiff's test results were within the required

24   range.  The fact that some of plaintiff's glucose level tests were within range while others were

25   not would not permit a trier of fact to find that Dr. Padilla's conclusion that plaintiff's diabetes

26   was uncontrolled was erroneous, much less medically unacceptable under the circumstances.

27              b.   CHS Medical Record Treatment Sheet

28           Plaintiff also submits a copy of a Medical Record Treatment Sheet from CHS and

24

1  contends that it shows that his diabetes was "at its goal" in 2009.  ECF No. 73 at 18.  The

2  treatment sheet contains a notation dated November 3, 2009 that reads, in relevant part, "DM @

3  goal."  ECF No. 73 Exh. A at 80.  Defendants object on the grounds that plaintiff is a lay person

4  and is not qualified to interpret this medical record.  ECF No. 74-2 at 3.  The court has reviewed

5  this document and finds that the document makes no reference to whether plaintiff's diabetes was

6  at its goal with respect to eligibility for HCV treatment.  Plaintiff's interpretation of this treatment

7  sheet without more is insufficient to create a triable issue of fact as to whether plaintiff's diabetes

8  was controlled for purposes of receiving HCV therapy.

9             c.  A1C Glucose Tests

10        Plaintiff next takes issue with Dr. Padilla's interpretation of plaintiff's A1C levels.  In his

11  declaration, Dr. Padilla opined that in order to be eligible for HCV treatment, plaintiff's A1C

12  levels needed to be at 6.5%.  Padilla opined that plaintiff was ineligible for HCV treatment

13  because plaintiff's four A1C tests indicated levels of 8.7%, 8.8%, 9.2%, and 10.0%.  In response,

14  plaintiff argues that Dr. Padilla erred in using 6.5 as the A1C cutoff for HCV eligibility.  Plaintiff

15  contends that Policy 1714 does not define "poorly controlled" diabetes, and directs the court's

16  attention to a copy of the CDCR's 2008 "Inmate Medical Services Policies and Procedures" for

17  Hepatitis C, which contains the following notation: "EXCLUSION CRITERIA FOR HCV

18  TREATMENT . . . Medical conditions.  Patients with poorly controlled . . . diabetes mellitus

19  (hemoglobin A1C > 8.5%).  ECF No. 73 Exh. E at 90.  Plaintiff also submits a copy of his lab

20  results from his time at Mule Creek State Prison, which show that on May 22, 2013, plaintiff's

21  A1C level was at 8.3%.  ECF No. 73 at 21, Exh. V at 141.  Plaintiff asserts that the document

22  shows that plaintiff's A1C was 8.3% when he started receiving HCV treatment and that it

23  therefore "disputes defendants assertion that the patient's A1C had to be 6.5" in order to qualify

24  for HCV treatment.  ECF No. 76 at 8, ¶ 21.

25        Plaintiff is correct that the portion of Policy 1714 included in the record does not contain a

26  definition for "poorly controlled" diabetes.  However, plaintiff has not produced evidence that

27  would allow a trier of fact to find that it was medically unacceptable under the circumstances for

28  Dr. Padilla to conclude that plaintiff's A1C levels needed to be at 6.5% in order for plaintiff to be

25

1    eligible for treatment.  Plaintiff's own exhibits contain an assessment plan from Dr. Lopin in

2    which Lopin states that "therapy was recommended for [plaintiff's] hepatitis if [he] could achieve

3    better control of his diabetes, *i.e. bringing the A1C down to approximately 6.5.*"  ECF No. 32

4    Exh. D at 22 (emphasis added).

5         To the extent plaintiff relies on the May 22, 2013 test result to show that his A1C level did

6    not need to be at 6.5% in order to qualify for HCV treatment, this document fails to provide

7    sufficient support for plaintiff's claim.  This test result shows that plaintiff's A1C level was at

8    8.3%, but does not indicate that plaintiff actually received HCV treatment at this time.  Even if

9    plaintiff could establish that he received HCV treatment at a time when his A1C level was at

10   8.3%, this would not help plaintiff's argument because plaintiff's A1C levels were not at 8.3%

11   during the time he was incarcerated at SCMJ.  Rather, his four A1C tests taken at SCMJ indicate

12   that his lowest recorded A1C level was at 8.8%.  Thus, even if Dr. Padilla had required plaintiff's

13   A1C level to be at 8.5% rather than 6.5%, plaintiff still would not have been eligible for HCV

14   treatment.

15             d.   Plaintiff Not Informed of His Poorly Controlled Diabetes

16        Plaintiff repeatedly complains that he was never informed of his lab results or told that his

17   diabetes was uncontrolled, and asserts that he was misled into believing that his lab results were

18   normal because of grievance coordinator Cannon's statements in response to his grievances.

19   Specifically, plaintiff contends that Cannon mislead him when she denied his request for his lab

20   results and told him that "no news [was] good news" and that he could assume his results were

21   "normal for [him]."  While Cannon may have been negligent in making these statements, the fact

22   that plaintiff was not informed that his diabetes was uncontrolled has no effect on the propriety of

23   Dr. Padilla's determination that plaintiff's diabetes was uncontrolled and that plaintiff was

24   therefore ineligible for HCV treatment.

25        With respect to plaintiff's diabetes, defendants have produced evidence through sworn

26   declarations and medical records that Dr. Padilla reviewed plaintiff's medical history and lab tests

27   and determined based on his medical judgment that plaintiff's diabetes was poorly controlled.

28   Dr. Padilla's position is supported by his own expert declaration as well as copies of the glucose

1   test results he relied on in making his determination.  Even the medical records submitted by

2   plaintiff contain several notations indicating that plaintiff would need to "achieve better control of

3   his diabetes" before he could proceed with HCV therapy.  See ECF No. 73 Exh. L at 110:10-11,

4   110:18-19.  On this record, a rational trier of fact could not conclude that Padilla's determination

5   was medically unacceptable under the circumstances.  Accordingly, the undersigned finds that

6   there is no genuine dispute of fact as to whether Dr. Padilla was deliberately indifferent to

7   plaintiff's medical needs when he denied plaintiff HCV treatment based on his determination that

8   plaintiff was ineligible for treatment due to his poorly controlled diabetes.

9           3.  Continuing Alcohol Abuse

10          Plaintiff next asserts that a factual dispute exists regarding plaintiff's alleged continued

11  abuse of alcohol and that this dispute is material because Dr. Padilla relied on this finding in

12  denying plaintiff HCV treatment.  Specifically, plaintiff contends that Dr. Padilla could not have

13  determined based on the results of plaintiff's GGT tests that plaintiff's liver damage was caused

14  by continuing alcohol use as opposed to hepatitis C.  ECF No. 73 at 27-28.  Plaintiff asserts that

15  the GGT tests show only that the liver is damaged and do not point to a specific condition that

16  may be causing the injury.  Id.

17          In support of this argument, plaintiff submits a printout with the heading "Lab Tests

18  Online," which appears to be an article from the website of the American Association for Clinical

19  Chemistry.[18]  ECF No. 73 Exh. C at 84.  The article explains how the GGT is used, what it is used

20  for, and what GGT test results mean.  In relevant part, the article states that "[i]n general, an

21  increased GGT level indicates that a person's liver is being damaged *but does not specifically*

22  *point to a condition that may be causing the injury*."  Id. (emphasis added).  The article

23  acknowledges that GGT can be used to screen for chronic alcohol abuse, but goes on to state that

24  "[a]n elevated GGT level suggests that something is damaging the liver but does not indicate

25  

26  [18]  Defendants object to this exhibit on the grounds that the document is hearsay, lacks
    foundation, and lacks authentication.  Defendants further assert that because plaintiff is not a
27  medical expert, he is not qualified to interpret lab results and cannot rely on the article as the type
    of learned treatise used by medical professionals in rendering expert opinion testimony.  ECF No.
28  74-2 at 4.

1   specifically what . . . Elevated levels may be due to liver diseases, such as hepatitis or cirrhosis . .

2   They may also be caused by alcohol abuse or drugs that are toxic to the liver."  Id. at 84-85.

3   Plaintiff asserts that this article shows that Padilla could not have determined based on plaintiff's

4   GGT tests that plaintiff was using alcohol.  In addition, plaintiff asserts in a sworn declaration

5   that plaintiff has not had access to alcohol while in prison and has not had a drink since 1999.

6   ECF No. 73 Exh. P at 122.  Finally, plaintiff asserts that even if he was using alcohol, the "six

7   month clean and sober period" should have been waived as an eligibility criterion pursuant to

8   Policy 1714, which provides for waiver of this period where the patient's condition is

9   deteriorating.

10        Here, the court finds that even if there is a dispute of fact as to whether plaintiff was

11   continuing to abuse alcohol during his time at SCMJ, the dispute is not material.  See Anderson v.

12   Liberty Lobby, Inc., 477 U.S. at 248 (a material fact is one that might affect the outcome of the

13   suit under the governing law).  Dr. Padilla states in his declaration that plaintiff was ineligible for

14   HCV treatment because of an *absolute* contraindication to treatment: poorly controlled diabetes.

15   The undisputed evidence establishes that under Policy 1714, patients who have absolute

16   contraindications for treatment will not be referred for treatment, and poorly controlled diabetes is

17   an absolute contraindication for HCV therapy.  Thus, a finding that plaintiff was not using alcohol

18   would not permit a trier of fact to conclude that Padilla's decision to deny HCV therapy was

19   medically unacceptable under the circumstances because Padilla's decision would still be

20   supported by plaintiff's poorly controlled diabetes.  Because a dispute of fact regarding plaintiff's

21   alcohol use is not material, plaintiff's evidence here does not defeat defendants' motion for

22   summary judgment.

23        4.  Cirrhosis Treatment

24        The majority of plaintiff's arguments concern his lack of treatment for hepatitis C rather

25   than cirrhosis.  However, because plaintiff initially claimed that that he was denied treatment for

26   both hepatitis C and cirrhosis, the court now addresses plaintiff's cirrhosis treatment.

27   Defendants' evidence establishes that plaintiff was prescribed Lactulose for treatment of his

28   cirrhosis, and that plaintiff twice refused to take his medication and subsequently asked that the

1   Lactulose be permanently discontinued.  In response, plaintiff argues that he only refused the

2   Lactulose because he was not told what it was for and that he would not have refused it if he had

3   known it was for cirrhosis.  The record indicates that after plaintiff complained in his letter to

4   Maness that he was not told what the Lactulose was for, Cannon informed plaintiff that if he

5   wanted to start taking Lactulose again, he should contact a nurse.  The record is unclear as to

6   whether plaintiff contacted a nurse or started taking Lactulose again, but considering that plaintiff

7   was given instructions on how he could resume treatment of his cirrhosis, there is no basis for a

8   trier of fact to find that Padilla was deliberately indifferent to plaintiff's serious medical need for

9   treatment of his cirrhosis.

10              5.  Conclusion

11          In sum, defendants have produced evidence that Dr. Padilla relied on plaintiff's lab

12   results, medical history, and Dr. Padilla's own medical judgment in determining that plaintiff's

13   poorly controlled diabetes rendered him ineligible for HCV treatment.  Plaintiff has not

14   sufficiently rebutted defendants' evidence and has not established that a genuine dispute of

15   material fact exists regarding whether Padilla's decision was medically acceptable under the

16   circumstances and in conscious disregard of an excessive risk to plaintiff's health.  Accordingly,

17   the undersigned recommends that defendants' motion for summary judgment be granted as to

18   plaintiff's deliberate indifference claim.

19       IX.    Monell Claim

20          The court now turns to plaintiff's claims against defendants Padilla and Jones in their

21   official capacities.  An "official capacity" lawsuit is simply another way of pleading an action

22   against the employing entity.  Monell v. Dept. of Social Services of New York, 436 U.S. 658

23   (1978).  In order to establish liability under Monell, a plaintiff must prove that (1) that [the

24   plaintiff] possessed a constitutional right of which he was deprived; (2) that the municipality had

25   a policy; (3) that this policy amounts to deliberate indifference of the plaintiff's constitutional

26   right; and (4) that the policy is the moving force behind the constitutional violation."  Dougherty

27   v. City of Covina, 654 F.3d 892, 900 (9th Cir. 2011) (internal quotation marks omitted).  Liability

28   may also be established based on the adoption of an unconstitutional custom, even if that custom

29

1   has not received formal approval through the entity's official decision-making channels.  Neveu

2   v. City of Fresno, 392 F.Supp.2d 1159, 1171 (E.D.Cal.2005) (quoting Monell, 436 U.S. at 690-

3   91).  Liability based on municipal policy may be satisfied in three ways:

>    (1) by showing that a municipal employee committed the alleged
>    constitutional violation under a formal governmental policy or
>    longstanding practice that is the customary operating procedure of
>    the local government entity;
>
>    (2) by establishing that the individual who committed the
>    constitutional tort was an official with final policymaking authority
>    and that the challenged action itself was an act of official
>    governmental policy; or
>
>    (3) by proving that an official with final policymaking authority
>    either delegated policymaking authority to a subordinate or ratified
>    a subordinate's unconstitutional decision or action and the basis for
>    it.

12   Sepatis v. City & County of San Francisco, 217 F.Supp.2d 992, 1005 (N.D. Cal. 2002) (quoting

13   Fuller v. City of Oakland, Cal., 47 F.3d 1522, 1534 and Gillette v. Delmore, 979 F.2d 1342,

14   1346–47 (9th Cir.1992)).

15         The court first notes that because plaintiff did not become aware of SCMJ's hepatitis C

16   treatment policy (Policy 1714) until after the first amended complaint was filed, the allegations

17   set forth in plaintiff's first amended complaint are framed differently in his opposition to

18   defendants' motion for summary judgment.  Specifically, in his first amended complaint, plaintiff

19   alleged an outright policy of not providing treatment for hepatitis C, based on Cannon's statement

20   that CHS does not treat hepatitis C.  On summary judgment, however, plaintiff argues that there is

21   a written policy providing for hepatitis C treatment, i.e. Policy 1714, but that there is a custom of

22   disregarding the written treatment policy.  Plaintiff alleges that he was denied treatment according

23   to this unwritten custom.

24         Specifically, plaintiff argues on summary judgment that Dr. Padilla "[did] absolutely

25   nothing to determine[] if plaintiff was eligible for HCV treatment" and instead "collaborated with

26   Kelly Cannon" to disregard the written treatment policy in order to deny plaintiff HCV treatment.

27   ECF No. 73 at 54- 55, 58.  According to plaintiff, the policy of disregarding Policy 1714 is

28   persistent and widespread because he "tried for thirty eight months to be treated for HCV" but

30

1   was denied treatment.  Plaintiff asserts that by Padilla's own admission, Padilla is a policymaking

2   official because one of Padilla's responsibilities as Medical Director is "to collaborate with other

3   individuals regarding and several committees on policies for the administration of health services

4   to inmates at [SCMJ] . . . and adhere to those policies."  Plaintiff further contends that Padilla had

5   actual or constructive knowledge that plaintiff was denied treatment according to the unwritten

6   custom of non-treatment because Padilla either decided with Cannon to "invoke" the policy of

7   non-treatment or reviewed Cannon's invocation of the policy and failed to correct it.

8        Defendants argue that they are entitled to summary judgment because plaintiff has not

9   established an underlying constitutional violation, Cannon's statements are insufficient to

10   establish a policy or custom that is persistent and widespread, there is no evidence that Cannon

11   caused plaintiff to be denied medical treatment, and Cannon is not a policymaking official.

12        As discussed above, the undersigned finds that plaintiff was not deprived of a

13   constitutional right when he was denied HCV therapy while incarcerated at SCMJ.  Accordingly,

14   plaintiff cannot establish one of the essential elements of a Monell violation and defendants are

15   entitled to summary judgment on this claim.  See Celotex, 477 U.S. at 322 ("[A] complete failure

16   of proof concerning an essential element of the nonmoving party's case necessarily renders all

17   other facts immaterial.").

18        Moreover, even assuming that a constitutional violation occurred, plaintiff still could not

19   prevail on his Monell claim because the evidence before the court would not permit a rational

20   trier of fact to conclude that the alleged policy of non-treatment was the "moving force" behind

21   the denial of HCV treatment.  Construed in the light most favorable to plaintiff, the record

22   indicates that Padilla and Cannon reviewed plaintiff's medical file together and that following this

23   review, Cannon informed plaintiff that CHS does not treat hepatitis C.  If this were the only

24   evidence before the court, it might be sufficient to permit the inference that the reason Padilla did

25   not provide plaintiff with HCV therapy was because SCMJ had a policy of not treating hepatitis

26   C.  However, defendants have provided evidence that the reason plaintiff was denied treatment

27   was not because of Cannon's statement or a policy of non-treatment, but because plaintiff was

28   found ineligible for HCV therapy pursuant to Policy 1714.  To rebut this evidence, plaintiff was

31

1   required to provide at least some evidence from which a trier of fact could reasonably conclude

2   that Cannon's statement was evidence of a custom of non-treatment and that Dr. Padilla denied

3   plaintiff treatment because of this custom and not because plaintiff was ineligible for treatment.

4   See Dougherty, 654 F.3d at 900.  Plaintiff has failed to meet that burden.  Plaintiff's conclusory

5   allegation that Padilla "[did] absolutely nothing" to determine if he was eligible for HCV

6   treatment does not create a triable issue of fact.  While plaintiff argues that Padilla never met with

7   or examined plaintiff and that plaintiff was never told he was ineligible for treatment, these facts

8   do not give rise to the inference that Padilla did nothing to determine whether plaintiff was

9   eligible for HCV therapy.  Nor do they rebut Padilla's sworn statement that his determination was

10   based on his review of plaintiff's medical history and lab results, as well as his own medical

11   judgment.  In light of Dr. Padilla's expert declaration and plaintiff's medical records and lab test

12   results, to conclude that Dr. Padilla's decision was based on a custom of non-treatment rather than

13   on his medical opinion would be, on this record, entirely speculative.  Because a rational trier of

14   fact could not find that plaintiff was denied HCV therapy because of a custom of non-treatment,

15   and because no constitutional violation occurred, defendants are entitled to summary judgment on

16   this claim.

17   MOTION TO AMEND THE COMPLAINT

18        Plaintiff moves to amend the first amended complaint on the grounds that he has

19   discovered new evidence relevant to his claim and asserts that defendants Cannon and Maness

20   should be re-joined as defendants.  ECF No. 64.  Defendants oppose the motion and assert that

21   even if the court considers the allegations in the proposed amended complaint, plaintiff is still not

22   entitled to relief.  ECF No. 67.

23        As described above, the main difference between the proposed second amended complaint

24   (SAC) and the first amended complaint on which this action proceeds is that in the SAC, plaintiff

25   unequivocally alleges that SCMJ has a written policy in place for treating hepatitis C.  However,

26   plaintiff primarily uses this fact to allege that Cannon lied about the existence of the policy and

27   that plaintiff was denied HCV treatment because of Cannon's lie.  Other than his conclusory

28   allegations that Dr. Padilla relied on Cannon's misstatement of the policy in denying plaintiff

32

treatment, plaintiff has alleged no facts that plausibly give rise to an inference that Cannon's

statement caused plaintiff to be denied treatment.  In this regard, plaintiff's SAC suffers from the

same deficiencies this court identified in plaintiff's FAC, which resulted in the initial dismissal of

defendants Cannon and Maness pursuant to the court's September 18, 2013 order, ECF No. 45.

Like the FAC, plaintiff's SAC fails to sufficiently allege a causal connection between the acrions

of Cannon and Maness and the alleged deprivation of plaintiff's constitutional rights.  Moreover,

as discussed above, the undersigned finds that no constitutional violation occurred when plaintiff

was denied HCV therapy.  As a result, amendment in this case would be an exercise in futility.

See Steckman v. Hart Bewing, Inc., 143 F.3d 1293, 1298 (9th Cir.1998) ("Although there is a

general rule that parties are allowed to amend their pleadings, it does not extend to cases in which

any amendment would be an exercise in futility, or where the amended complaint would also be

subject to dismissal ...") (citations omitted).  It is therefore recommended that plaintiff's motion

to amend the complaint be denied.

   Accordingly, IT IS HEREBY RECOMMENDED that:

   1.  Defendants' motion for summary judgment (ECF No. 66) be GRANTED; and

   2.  Plaintiff's motion for leave to amend the amended complaint (ECF No. 64) be DENIED.

   These findings and recommendations are submitted to the United States District Judge

assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

after being served with these findings and recommendations, any party may file written

objections with the court, which shall be captioned "Objections to Magistrate Judge's Findings

and Recommendations."  **Due to exigencies in the court's calendar, no extensions of time will

be granted.**  A copy of any objections filed with the court shall also be served on all parties.  The

parties are advised that failure to file objections within the specified time may waive the right to

appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: March 18, 2015

allison Clarie

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

33